IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

AB STAFFING SOLUTIONS, LLC *et al.*,
    Plaintiffs,

    v.                               Civil No. 3:22cv32 (DJN)

ASEFI CAPITAL, INC.,
    Defendant.

## MEMORANDUM OPINION

This case arises out of an agreement between three entities to provide medical staffing services to the states of Idaho and Washington to alleviate hospital staffing and supply shortages caused by COVID-19.  However, the parties dispute the scope and terms of that agreement, with each having a different view of the nature of the arrangement and who bears the blame for issues with invoicing and receiving payment from the States.  This matter comes before the Court on the parties' cross-motions to dismiss.  For the reasons stated below, the Court will GRANT IN PART and DENY IN PART Defendant ACI Federal Inc.'s Motion to Dismiss Counts One and Four Through Nine of the First Amended Complaint (ECF No. 50).  Additionally, the Court will GRANT IN PART and DENY IN PART Plaintiffs' Motion to Dismiss ACI Federal's Counterclaim (ECF No. 44).

# I.    FACTUAL BACKGROUND[1]

## A.    Plaintiffs' Amended Complaint

### i.    The Parties and the Contracts

Plaintiff AB Staffing Solutions, LLC ("ABSS"), an Arizona limited liability company,

has its principal place of business in Arizona. (Amended Complaint ("Am. Compl.") (ECF No.

43) ¶ 2.) Plaintiff Bay Area Anesthesia, LLC, d/b/a World Wide Medical ("WWM"), an Arizona

limited liability company, also has its principal place of business in Arizona. (Am. Compl. ¶ 3.)

ABSS and WWM (collectively, "Plaintiffs") provide healthcare staffing solutions and have

developed experience and knowledge related to providing contract nursing, allied health, therapy

and physician services to government and commercial facilities throughout the country. (Am.

Compl. ¶ 4.) Defendant ACI Federal ("ACI") is a Delaware corporation with its principal place

of business in Virginia. (Am. Compl. ¶ 5.) ACI contracts with the government to provide

healthcare solutions to the armed forces and various federal agencies. (Am. Compl. ¶ 5.)

Each party held a contract issued under the General Services Administration ("GSA")

Federal Supply Schedule ("FSS") program 6211, which covers vendors who provide a variety of

healthcare services. (Am. Compl. ¶ 9.) The FSS program prescreens vendors for technical

capability and to establish government-wide pricing. (Am. Compl. ¶ 10.) Contracting agencies

may issue requests for quotations to schedule vendors to perform work specified in a task order

or purchase order. (Am. Compl. ¶ 10.) Contracting agencies may also issue requests for

---

[1]     At this stage, the Court must accept as true the facts set forth in the Amended Complaint
for the purposes of resolving Defendant's Motion to Dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662,
678 (2009). For the purposes of resolving Plaintiffs' Motion to Dismiss, the Court will accept as
true the facts set forth in Defendant's Counterclaim (ECF No. 36).

quotations to establish a Basic Ordering Agreement ("BOA"), which the Federal Acquisition

Regulations define as:

> a written instrument of understanding, negotiated between an agency, contracting
> activity, or contracting officer and a contractor, that contains (1) terms and clauses
> applying to future contracts between the parties during its term, (2) a description, as
> specific as possible, of supplies or services to be provided, and (3) methods for pricing,
> issuing, and delivering future orders under the basic ordering agreement.  A basic
> ordering agreement is not a contract.

(Am. Compl. ¶ 11 (quoting 48 C.F.R. § 16.703(a)).)

Contractors may enter into a Contractor Teaming Arrangement, a special ordering

procedure whereby the contractors join forces to compete for and perform orders placed under

the Schedule program.  (Am. Compl. ¶ 12.)  The contracting agency issues an order to the team,

but each team member remains in direct privity with the Government in all respects.  (Am.

Compl. ¶ 12.)  Effective June 11, 2020, ABSS, WWM and ACI entered into a Contractor

Teaming Arrangement to submit a proposal to the Department of Homeland Security, Federal

Emergency Management Agency under a solicitation for a Hospital Support Services BOA, with

each party considered a "Team Member."  (Am. Compl. ¶ 13; Ex. A to Am. Compl. (the

"CTA").)

The CTA designated ACI as the "Team Lead," making it responsible for "managing the

overall contract and project management; providing consolidated reporting to FEMA with

support from Team Members; providing a single point of contact to Hospital Support Services

BOA to resolve technical and performance issues."  (Am. Compl. ¶ 15.)  The CTA provides that

each Team Member will generate invoices "separately" to the Government for "the services

rendered from each [Member's] FSS Schedule Contract."  (Am. Compl. ¶ 21 (quoting CTA at

¶ 9(f).)  Under the CTA, the parties teamed to meet FEMA's need for hospital support services to

accommodate the increase in patient population due to COVID-19 in Washington, Oregon, Idaho

and Alaska. (Am. Compl. ¶ 16.) The Government issued the BOA to the CTA effective August 19, 2020. (Am. Compl. ¶ 17.) The BOA separately listed each Team Member, but it did not identify ordinary subcontractors. (Am. Compl. ¶ 17.)

Following the issuance of the BOA, ACI, in its capacity as Team Lead, pursued contract opportunities to provide services to the States of Idaho and Washington (the "States"). (Am. Compl. ¶ 19.) On September 1, 2021, and September 27, 2021, Idaho and Washington, respectively, awarded purchase orders to the Team. (Am. Compl. ¶ 20.) The CTA governed these orders, which were issued under the BOA. (Am. Compl. ¶ 20.)

### ii.    ACI's Invoicing

ACI insisted on invoicing for all Team Members and refused to relinquish those duties. (Am. Compl. ¶ 21.) Plaintiffs allege that ACI failed to provide full transparency with respect to billing, receipt of monies from the States and how it distributed those monies. (Am. Compl. ¶ 22.) Additionally, ACI failed to submit invoices to the States following Plaintiffs' transmission of the invoices to ACI. (Am. Compl. ¶ 22.) ACI had all of the information that they needed to immediately process the invoices, but still failed to timely process them. (Am. Compl. ¶ 28.)

Plaintiffs allege that these deficiencies caused them severe cash-flow shortages. (Am. Compl. ¶ 23.) As of January 19, 2022, ABSS had $34,574,084.61 in past due invoices based on Net 30-day terms of payment and a total amount due of $57,369,095.26. (Am. Compl. ¶ 24.) WWMS had $2,888,216.00 in past due invoices based on Net 30-day terms and a total past due amount of $6,002,883.36. (Am. Compl. ¶ 25.) Until Plaintiffs filed their original complaint, ACI had never disputed the validity of Plaintiffs' invoices, except in minor circumstances involving a hard to read receipt. (Am. Compl. ¶ 27.) Instead, ACI could not keep up with the

volume of billings resulting from the parties' work under the BOA orders.  (Am. Compl. ¶ 27.)
Even the States complained about ACI's billing and invoicing practices.  (Am. Compl. ¶ 29.)
Plaintiffs attempted to work with ACI to reconcile their invoices, but ACI was not forthright with
the details and status of the invoices.  (Am. Compl. ¶ 29.)

ACI would submit its own invoices along with Plaintiffs' invoices to the States.  (Am.
Compl. ¶ 30.)  However, the ACI invoices contained flaws and would not result in full payment
from the States, while Plaintiffs' invoices did not contain flaws and resulted in full payment.
(Am. Compl. ¶ 30.)  Yet, ACI would retain the proceeds received from the States to pay its own
invoices rather than passing on payments to Plaintiffs.  (Am. Compl. ¶ 31.)  In sum, Plaintiffs
allege that ACI retained payments from the States that should have gone to Plaintiffs and,
instead, used those monies to pay itself and its subcontractors before paying Plaintiffs.  (Am.
Compl. ¶ 32.)  ACI did not explain what issues with Plaintiffs' invoices would have resulted in
the withholding of such payments from the States.  (Am. Compl. ¶ 33.)  Additionally, ACI failed
to fully account for the status of the invoices submitted by Plaintiffs, which showed a major
discrepancy in the amounts owed to Plaintiffs.  (Am. Compl. ¶ 36.)

ACI's inability to perform its basic invoicing function left Plaintiffs short of cash and
threatened their ability to continue to provide staffing.  (Am. Compl. ¶ 38.)  ABSS had to max
out its revolving line of credit (with three increases) with its bank and struggled to pay its own
employees.  (Am. Compl. ¶ 38.)  Additionally, GSA notified all Team Members that if they
failed to perform their duties, it would cancel the BOA and record that negative action in the
Team Members' Contract Performance Ratings.  (Am. Compl. ¶ 38.)  This negative rating would
have had devastating effects on Plaintiffs' future contracting opportunities.  (Am. Compl. ¶ 39.)

Plaintiffs repeatedly offered to take the burden of billing and collections for their services, but ACI refused.  (Am. Compl. ¶ 34.)  Because ACI did not cooperate in Plaintiffs' attempts to formulate a solution, Plaintiffs engaged the assistance of GSA.  (Am. Compl. ¶¶ 40-41.)  GSA reviewed the issues and recommended that all teaming partners bill the States individually, including that ACI help coordinate direct billing and retract any unpaid invoices so that Plaintiffs could submit them directly to the States.  (Am. Compl. ¶ 42.)  ACI ignored GSA's recommendation and continued to control all invoicing and collections, but failed to improve in its performance of such.  (Am. Compl. ¶ 45.)

ACI refused further attempts by Plaintiffs to resolve the issues, including the establishment of an escrow account.  (Am. Compl. ¶¶ 46-47.)  Instead, it claimed that it had added additional resources and reassigned job duties to remedy the issue at hand, but this did not remedy the issue.  (Am. Compl. ¶¶ 49-50.)

### iii.    The Complaint and Term Sheet

On January 20, 2022, Plaintiffs filed the original complaint in this action to recover its outstanding receivables.  (Am. Compl. ¶ 57; ECF No. 1.)  On February 1, 2022, Plaintiffs filed a motion for a preliminary injunction that would require ACI to provide full transparency, account for all invoicing and the status of those invoices and submit all monies received from the States into an escrow account.  (Am. Compl. ¶ 58; ECF Nos. 7-8.)  Before the Court held a hearing on the motion for a preliminary injunction, the parties reached an agreement and entered into a Term Sheet as a partial settlement of Plaintiffs' motion and claims.  (Am. Compl. ¶ 59.)  The Term Sheet imposed obligations on the parties regarding a forensic audit, as well as other obligations relating to the timing that ACI would remit payment that it received from the States. (Am. Compl. ¶ 60.)  Based on the Term Sheet, Plaintiffs withdrew their motion for a preliminary

injunction.  (Am. Compl. ¶ 61.)  However, Plaintiffs allege that Defendant has repeatedly

breached the Term Sheet.[2]  (Am. Compl. ¶ 64.)  Through this process, Plaintiffs learned of

substantial sums that the States had paid ACI that ACI had not remitted to Plaintiffs.  (Am.

Compl. ¶¶ 74, 78, 81-82.)  As of June 8, 2022, Plaintiffs allege that ACI owes ABSS

$10,096,654.33 and it owes WWM $6,489,687.20 for services rendered.  (Am. Compl. ¶¶ 84-

85.)

### iv.    Causes of Actions

On June 8, 2022, Plaintiffs filed the Amended Complaint.  Based on the above factual

allegations, Plaintiffs bring ten causes of action against Defendant.  In Count One, Plaintiffs

allege a breach of contract for Defendant's failure to comply with its duties under the CTA.

(Am. Compl. ¶¶ 129-42.)  In Count Two, Plaintiffs allege a breach of the Term Sheet.  (Am.

Compl. ¶¶ 143-49.)  In Count Three, Plaintiffs allege fraud in the inducement for the manner in

which the parties entered into the Term Sheet.  (Am. Compl. ¶¶ 150-55.)  In Count Four,

Plaintiffs allege a claim of breach of fiduciary duty.  (Am. Compl. ¶¶ 156-61.)  In Count Five,

Plaintiffs allege a claim for conversion for the funds that Defendant has not remitted to Plaintiffs.

(Am. Compl. ¶¶ 162-67.)  In Count Six, Plaintiffs request an accounting in equity, stemming

from its allegation that Defendant breached its fiduciary duty to Plaintiffs.  (Am. Compl. ¶¶ 168-

69.)  In Count Seven, Plaintiffs request a declaratory judgment that they may separately invoice

the States directly for the services rendered by Plaintiffs.  (Am. Compl. ¶¶ 170-73.)  In Count

Eight, Plaintiffs allege actual fraud for Defendant's misrepresentations that it had the capability

to manage the billing and disbursement of contract proceeds.  (Am. Compl. ¶¶ 174-84.)  In

---

[2]    Plaintiffs allege numerous facts to support their claim that Defendant breached the Term Sheet.  However, as Defendant has not moved to dismiss Plaintiffs' counts related to the breach of the Term Sheet, the Court will not recite those facts here.

Count Nine, Plaintiffs allege constructive fraud based on similar allegations. (Am. Compl. ¶¶ 185-95.) Finally, in Count Ten, Plaintiffs assert a claim in the alternative for unjust enrichment and quantum merit. (Am. Compl. ¶¶ 196-211.)

### v.    Defendant's Motion to Dismiss

On June 22, 2022, Defendant filed its Motion Under Rules 9 and 12(b)(6) to Dismiss Counts One and Four Through Nine of the First Amended Complaint (ECF No. 50) and its Memorandum of Law in Support of its Motion (("Def.'s MTD Mem.") (ECF No. 51)). Defendant did not move to dismiss Counts Two and Three — those related to the Term Sheet — or Count Ten, the unjust enrichment claim. On July 6, 2022, Plaintiffs filed their Memorandum of Law in Opposition to Defendant's Motion to Dismiss Plaintiffs' Amended Complaint (("Pls.' MTD Opp.") (ECF No. 56)) and, on July 12, 2022, Defendant filed its Reply (("Def.'s MTD Reply") (ECF No. 58)). Defendant's Motion is now ripe for review.

### B.    Defendant's Counterclaim

On May 25, 2022, Defendant filed its Amended Answer and Counterclaim (("Counterclaim") (ECF No. 36)). Defendant alleges the following facts and causes of action.

In the first half of 2020, ACI identified an opportunity to provide staffing and equipment to hospitals during the pandemic. (Counterclaim ¶ 7.) It sought teammates and approached ABSS, who had its own schedule contract with GSA, about an opportunity to team together to submit a proposal to GSA for the work. (Counterclaim ¶ 8.) ABSS encouraged ACI to bring WWM, who also had its own schedule contract with GSA, into the team, but it did not tell WWM that the owner of WWM was a co-owner of ABSS. (Counterclaim ¶ 9.) On June 11, 2020, ACI, ABSS and WWM entered into the CTA, agreeing that ACI would serve as Team Leader and submit a proposal to GSA. (Counterclaim ¶ 10.)

The CTA provided that each team member would use its own GSA schedule contract to provide services to the Government, maintaining direct privity with the Government through its existing GSA schedule contract. (Counterclaim ¶ 11.) The three would compete with each other for customers' purchase orders. (Counterclaim ¶ 11.) Then, each would receive its own purchase orders from customers through its GSA schedule contract and would submit invoices directly to customers pursuant to its own GSA schedule contract. (Counterclaim ¶ 11.) On August 19, 2020, ACI, GSA and FEMA executed a BOA. (Counterclaim ¶ 12.) The BOA did not order any services or supplies, but it provided the legal authority for Government customers to use FEMA funds to order services and supplies from the three companies. (Counterclaim ¶ 12.)

On September 1, 2021, the State of Idaho, Military Division ("IMD") issued a contract and related purchased order under the BOA for services at various hospital throughout Idaho. (the "IMD Contract") (Counterclaim ¶ 13.) On September 27, 2021, the Washington State Department of Health ("DOH") issued a purchase order under the BOA to ACI for nursing services at various hospitals throughout Washington. (Counterclaim ¶ 14.) On December 28, 2021, before the services expired, DOH issued a follow-on contract to ACI for services through March 23, 2022 (collectively, the "DOH contracts"). (Counterclaim ¶ 14.) Under the IMD and DOH contracts, the government entities issued many separate task orders to ACI for specific staffing and supply needs at specific hospitals. (Counterclaim ¶15.) IMD and DOH issued the task orders only to ACI and did not direct them to ABSS or WWM, nor did the task orders specifically request services from ABSS or WWM. (Counterclaim ¶ 15.) Upon receiving the task orders, ACI determined how to fulfill the requirements, often using its own employees and

9

other times subcontracting some of the work to other companies, including ABSS and WWM. (Counterclaim ¶ 16.)

### i.      ACI as Prime Contractor

ACI alleges that, after the execution of the CTA and BOA, the three parties reached an agreement as to how ABSS and WWM would help satisfy the requirements set forth in the task orders issued to ACI. (Counterclaim ¶ 16.) With respect to the task orders issued to ACI, they entered into a traditional prime-subcontractor agreement, with ACI as the prime and ABSS and WWM as the subcontractors. (Counterclaim ¶ 16.) ACI alleges that DOH has stated that ACI has sole privity with DOH for the contracts and task orders that DOH issued to ACI, reaffirming this position in a filing in Washington state court in a lawsuit filed by Plaintiffs. (Counterclaim ¶ 18.)

For contracts issued to ACI, ACI alleges that it would ask ABSS and WWM if they wanted to help fill any of the services requested, but it retained sole discretion as to how to staff each task order. (Counterclaim ¶ 19.) ACI, ABSS and WWM agreed that Plaintiffs would send their invoices to ACI, who would consolidate their invoices with other subcontractors' invoices and send them to DOH and IMD. (Counterclaim ¶ 20.) The parties also agreed to the same specific hourly rates that they would pay to nurses and the billing rates that they would charge. (Counterclaim ¶ 21-22.) Those rates billed included ACI's administrative fee of 5.6%, so that ACI could recover the costs of its services of program management. (Counterclaim ¶ 22.) Because the parties agreed to all of the hallmarks of a class prime-subcontractor agreement, ACI claims that the CTA's provisions about "direct privity" with and direct invoicing to customers do not apply to the task orders issued to ACI. (Counterclaim ¶ 24.) ACI alleges that the CTA did

not address services that one company might provide to another company under a task order issued to the other company.  (Counterclaim ¶ 29.)

Unlike its agreements with other subcontractors for ACI, Plaintiffs and ACI did not execute a written agreement specific to the services that ABSS and WWM provided under the task orders issued to ACI.  (Counterclaim ¶ 27.)  Instead, their conduct and communications established enforceable implied-in-fact contracts, which included all of the material terms. (Counterclaim ¶ 27.)

### ii.    Invoicing Issues

ACI alleges that the work ordered by DOH and IMD "grew far beyond anyone's expectations" due to the severe staffing shortages created by the pandemic.  (Counterclaim ¶ 32.) ABSS and WWM began deluging ACI with invoices for their work under ACI's task orders, often hundreds a week.  (Counterclaim ¶ 34.)  They submitted batches of invoices at different times each week in no particular order.  (Counterclaim ¶ 34.)  Over six months, Plaintiffs submitted thousands of jumbled invoices and supporting documentation that forced ACI to spend enormous efforts to evaluate and consolidate, adding significant chaos to ACI's ability to obtain payments from IMD and DOH.  (Counterclaim ¶ 34.)  Defendant alleges that other subcontractors did not deluge ACI with a comparable number of invoices despite providing similar or more complex services.  (Counterclaim ¶ 35.)  The invoices had numerous errors, including erroneous calculations or lack of supporting documentation.  (Counterclaim ¶ 37.)

ACI asked Plaintiffs to invoice it twice a month, but Plaintiffs refused.  (Counterclaim ¶ 36.)  ACI had to audit Plaintiffs' invoices, rejecting erroneous invoices for inaccurate math or missing supporting documentation.  (Counterclaim ¶ 37.)  Additionally, WWM repeatedly reported invoices on its accounts receivable reports to ACI that it never submitted or were

inaccurate.  (Counterclaim ¶ 38.)  ACI retained a vendor, Pantheon Solutions, LLC ("Pantheon") to provide additional resources to audit Plaintiffs' invoices, but it did not receive additional compensation for retaining Pantheon's services.  (Counterclaim ¶ 39.)

Because of the deluge of invoices and the loss of staffing, DOH processed and paid ACI's invoices on an extremely slow basis.  (Counterclaim ¶¶ 40-41.)  DOH had errors in its payments and consistently changed the invoicing procedures and requirements, slowing down the process of ACI receiving payment and remitting payment to its subcontractors. (Counterclaim ¶ 43.)

### iii.    Plaintiffs Campaign to Discredit ACI

ACI alleges that Plaintiffs undertook a campaign to discredit ACI with GSA, IMD and DOH so that they could gain sole control of the work for DOH and IMD.  (Counterclaim ¶ 45.) They falsely told the government entities that ACI had failed to process their invoices or pay them and blamed ACI for mismanaging the invoicing and payment processing, despite Plaintiffs causing many of the problems.  (Counterclaim ¶¶ 46-47.)  Plaintiffs further misrepresented to GSA officials that ACI spent their money on boats rather than paying Plaintiffs.  (Counterclaim ¶ 49.)  In addition to other falsehoods about ACI, Plaintiffs falsely claimed to be in dire economic conditions and would have to withdraw nurses from hospitals if they did not receive payments directly from the States rather than ACI.  (Counterclaim ¶ 53.)  ACI claims that ABSS had sufficient financial resources to continue paying its nurses.  (Counterclaim ¶ 54.)  On April 21, 2022, ABSS asked Plaintiff not to pay invoices submitted by ACI.  (Counterclaim ¶ 57.) Plaintiffs also showed their unfiled complaint in this action to portray ACI in a false light. (Counterclaim ¶ 58.)

Plaintiffs' efforts succeeded, as DOH effectively stopped paying most invoices submitted by ACI. (Counterclaim ¶ 59.)  DOH also agreed that Plaintiffs could directly submit their own invoices to DOH for work performed under task orders issued to ACI, despite ACI never agreeing to this arrangement. (Counterclaim ¶ 60.)  This harmed ACI's reputation with the government entities and other subcontractors. (Counterclaim ¶ 61.)

Eventually, Plaintiffs succeeded in cutting ACI out of Washington. (Counterclaim ¶ 62.) On January 8, 2022, DOH awarded contracts to Plaintiffs "for exactly some of the same work for which DOH was already under contract to obtain from ACI." (Counterclaim ¶ 63.)  Later, DOH also awarded at least one follow-on contract to ABSS for the same work but in later time periods as the task orders issued to ACI. (Counterclaim ¶ 65.)  ACI alleges that if Plaintiffs had not lied about ACI or threatened to pull nurses from hospitals, it "unquestionably would have received the work under the ABSS-DOH Follow-On Contract." (Counterclaim ¶ 66.)  It would have performed some of the work itself for profit and subcontracted out some of the work and received its 5.6% administrative fee. (Counterclaim ¶ 66.)  ACI claims that Plaintiffs converted and received at least $125 million in orders for work that DOH had contracted to obtain from ACI. (Counterclaim ¶ 67.)  ACI further claims that Plaintiffs attempted a similar campaign with IMD, but IMD saw through it and continued to contract with ACI and, eventually, refused to let the team fill nursing positions with ABSS employees. (Counterclaim ¶¶ 68-74.)

### iv.    Causes of Action

Based on these factual allegations, ACI brought five causes of action in the Counterclaim.  In Count One, it alleges a breach of contract of the allegedly enforceable implied-in-fact subcontracts. (Counterclaim ¶¶ 75-84.)  In Count Two, ACI alleges tortious interference with existing contract, for Plaintiffs' efforts to interfere with ACI's contract with DOH.

13

(Counterclaim ¶¶ 85-96.)  In Count Three, ACI alleges tortious interference with business expectancy, claiming that Plaintiffs interfered with the work that ACI would have obtained from DOH.  (Counterclaim ¶¶ 97-104.)  In Count Four, ACI alleges Defamation for the allegedly false statements that Plaintiffs made to GSA, DOH and IMD about ACI.  (Counterclaim ¶¶ 105-10.)  Finally, in Count Five, Plaintiffs allege a statutory business conspiracy under Virginia law. (Counterclaim ¶¶ 111-16.)

### v.    Plaintiffs' Motion

On June 15, 2022, Plaintiffs filed a Motion to Dismiss ACI Federal's Counterclaim (ECF No. 44) and its Memorandum in Support (("Pls.' MTD Mem." (ECF No. 45)), moving under Federal Rule of Civil Procedure 12(b)(6) to dismiss all five counterclaims brought by Defendant. On June 29, 2022, Defendant filed its Memorandum of Law in Opposition to Counter-Defendants' Motion to Dismiss ACI Federal's Counterclaim (("Def.'s Opp.") (ECF No. 52)). On July 5, 2022, Plaintiffs filed their Reply in Support of their Motion to Dismiss (("Pls.' MTD Reply") (ECF No. 55)), rendering this matter now ripe for review.

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff.  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.

14

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

For the purposes of deciding a motion to dismiss, the Court will only consider those factual allegations set forth in the complaint or counterclaim. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). Additionally, the Court may consider documents attached to the complaint or counterclaim, Fed. R. Civ. P. 10(c), as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Where, as here, the complaint expressly relies upon documents integral to the complaint or counterclaim that the plaintiff did not attach, the Court can also consider those documents on a motion to dismiss. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) ("[W]hen a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the

complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'") (quoting *Phillips*, 190 F.3d at 618).  Where the bare allegations of the complaint or counterclaim conflict with any document incorporated therein, the document prevails.  *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

## III.   ANALYSIS

The Court addresses each motion separately, giving each pleading the required deference with respect to the other side's motion attacking that pleading.  Thus, for each motion, the Court will examine only the allegations in the pleading to which the party directs the motion. Accordingly, the Court will not consider the facts alleged in Plaintiffs' Amended Complaint when analyzing Plaintiffs' Motion to Dismiss the Counterclaim.  Nor will it consider Defendant's allegations in the Counterclaim when analyzing Defendant's Motion to Dismiss Plaintiffs' Amended Complaint.  The Court will first address Defendant's Motion to Dismiss Plaintiffs' Amended Complaint before turning to Plaintiffs' Motion to Dismiss Defendant's Counterclaim.

### A.   **Defendant's Motion to Dismiss Plaintiffs' Amended Complaint**

#### i.   **Plaintiffs' Claim for Breach of Contract Survives in Part and Fails in Part.**

In Count One, Plaintiffs allege that Defendant breached the CTA, "which is a valid and enforceable contract."  (Am. Compl. ¶ 130.)  Specifically, Plaintiffs allege that Defendant breached the CTA by preventing Plaintiffs from learning when the States paid ACI for Plaintiffs' invoices.  (Am. Compl. ¶ 135.)  Additionally, Plaintiffs allege that Defendant breached the covenant of good faith and fair dealing by failing to timely pay Plaintiffs and failing to submit Plaintiff's invoices to the States.  (Am Compl. ¶¶ 136-38.)  Defendant moves to dismiss this claim on the grounds that the CTA does not constitute a valid, binding contract and it does not

apply to work that Plaintiffs performed on contracts issued to Defendant.  (Def.'s MTD Mem. at 15.)

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).[3]

Defendant argues that the CTA fails the first prong for lack of an enforceable contract. Instead, the CTA merely represents an "agreement to agree," which does not bind the parties. Defendant cites to *GCI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183 (Va. 2018) and compares the CTA to a "teaming agreement" that merely contemplates a future prime-subcontractor agreement.  The Court disagrees with Defendant that the CTA does not constitute a binding agreement.

Under well settled law regarding the basic requirements for a valid contract, "an agreement must be definite and certain as to its terms and requirements; it must identify the subject matter and spell out the essential commitments and agreements with respect thereto." *Zoroastrian Ctr. & Darb-E-Mehr v. Rustam Guiv Found.*, 822 F.3d 739, 752 (4th Cir. 2016) (quoting *Progressive Const. Co. v. Thumm*, 161 S.E.2d 687, 691 (Va. 1968)).  This requires that a contract "must be sufficiently definite to enable a court to give it an exact meaning, and must obligate the contracting parties to matters definitely ascertained or ascertainable." *Id.* (quoting *Smith v. Farrell*, 98 S.E.2d 3, 7 (Va. 1957)).

---

[3]     For the majority of the claims at issue in the motions, the parties apply Virginia law. Accordingly, unless noted otherwise, the Court will apply Virginia law at this stage.

Here, the parties entered into the CTA which, rather than obligating them to enter into some future agreement, contained definite commitments and obligations. Indeed, the CTA sets forth terms upon which the parties agreed, "in consideration of the mutual covenants and promises stated herein." (CTA at 1.) These terms pertained to the parties' joint pursuit of government contracts and includes a term titled "Specific Team Activities and Delivery Responsibilities" that includes seven subparts. (CTA at 3-4.)

The CTA provides that Defendant's "individual primary delivery responsibility shall be for overall contract management, coordinating and delivering any consolidated reports required by FEMA and notifying [Plaintiffs] of any task order requests issued pursuant to Hospital Support Services BOA." (CTA at 3.) Plaintiffs, in turn, bore responsibility "for providing [Defendant] with any information required for joint reporting according to the Hospital Support Services BOA." (CTA at 3-4.) Based on these definite obligations, the Court finds the CTA sufficiently definite to constitute an enforceable contract. (CTA at 4.)

Although the CTA constitutes an enforceable contract, the Court does not find that it encompasses the broad scope of conduct that Plaintiffs advance. Most importantly, the CTA provides that "[i]nvoices will be generated separately to the Government by [Plaintiffs and Defendant] for the work which they have been individually awarded, which clearly indicates the services rendered from each parties' respective FSS Schedule Contract." (CTA at 4.) The CTA says nothing with respect to remitting payment.

### a. Plaintiffs Properly Allege that Defendant Breached the CTA by Preventing Plaintiffs from Invoicing the States, but not Through Its Own Invoicing Actions.

Plaintiffs allege that Defendant breached the contract by "prevent[ing] Plaintiffs from invoicing the State of Idaho directly" and by "preventing [Plaintiffs] from invoicing the State of Washington directly for services provided before January 9, 2022." (Am. Compl. ¶ 133.) The

Court agrees that this constitutes a breach of the CTA.  The CTA clearly states that the parties will separately invoice the Government for the work for which they have been individually awarded, and Plaintiffs allege that Defendants have taken actions to prevent them from doing so.

However, the gravamen of Plaintiffs' action stems from its allegation that Defendant failed to forward its invoices to the States and failed to remit the payment to Plaintiffs that Defendant had received from the States.  Yet, Defendant's obligations with respect to invoicing on behalf of Plaintiffs and remitting payment to Plaintiffs find no footing in the CTA.  Rather, the CTA states that the parties will individually invoice the Government.  Plaintiffs attempt to shoehorn Defendant's invoicing activities into its duty to "manage the overall contract and project management."  (Am. Compl. ¶ 132.)  But, finding that Defendant's management duties encompassed invoicing and payment contradicts the express terms of the contract, which provide that the parties will individually invoice the Government.

Rather than pointing to a provision in the CTA obligating Defendant to invoice and remit payments in a certain manner, Plaintiffs allege that Defendant "assumed the duty of invoicing and collections for all team members."  (Am. Compl. ¶ 132.)  Plaintiffs do not allege that the parties agreed to modify the CTA to expand Defendant's duties to include invoicing and collections.  In fact, they allege that Defendant unilaterally insisted on assuming these duties without the agreement of Plaintiffs.  But, a "legally enforceable obligation is shown by establishing an offer, acceptance, and valuable consideration." *Dutan v. Sheet Metal Remodeling, LLC*, 48 F. Supp. 3d 860, 870 (E.D. Va. 2014).  Indeed, to form an enforceable contract in Virginia, "there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances." *Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981).  "Mutual assent by the parties to the terms of a contract is crucial to the contract's

19

validity." *Wells v. Weston*, 326 S.E.2d 672, 676 (Va. 1985).  Plaintiffs do not allege any mutual

assent as to Defendant's invoicing and collections.  The allegations paint a picture of

Defendant's unilateral assumption of the invoicing duties, against the will of Plaintiffs — the

opposite of mutual assent.  Thus, although Defendant's alleged breach of their invoicing and

collection duties may subject them to liability under other theories of recovery, it does not

constitute a breach of the CTA or an agreement in addition to the CTA.

<b>b.  Plaintiffs do not State a Claim for Breach of the Implied Covenant of<br>Good Faith.</b>

  Plaintiffs attempt to bring Defendant's invoicing and collections breaches under the CTA

by alleging a breach of the covenant of good faith and fair dealing.  "Under Virginia law, every

contract contains an implied covenant of good faith and fair dealing." *Rogers v. Deane*, 992 F.

Supp. 2d 621, 633 (E.D. Va. 2014).  A breach of the implied covenant, however, "only gives rise

to a breach of contract claim, not a separate cause of action."[4] *Frank Brunckhorst Co. v. Coastal

Atl.*, 542 Supp. 2d 452, 462 (E.D. Va. 2008).   A claim for breach of the implied covenant of

good faith and fair dealing requires "(1) a contractual relationship between the parties, and (2) a

breach of the implied covenant." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450

(E.D. Va. 2009).  Here, a contractual relationship — the CTA — exists between the parties, so

only the question of whether Plaintiffs have properly alleged a breach of the implied covenant

remains.

---

[4]  Because a claim for breach of the implied covenant of good faith and fair dealing does
not furnish an independent cause of action, a party cannot raise it as a separate count in a
complaint. *Rogers*, 992 F. Supp. 2d at 633.  But a party can raise the claim as part of a count for
breach of contract. *Goodrich Corp v. BaySys Techs., LLC*, 873 F. Supp. 2d 736, 742 (E.D. Va.
2012).  Here, Plaintiffs allege breach of the implied covenant of good faith and fair dealing as
part of their breach of contract count.  Thus, Plaintiffs have raised the claim in the appropriate
context.

20

The implied covenant of good faith and fair dealing exists to protect a party's right "to receive the benefits of the agreement." *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 611 (4th Cir. 2021) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2021) (internal quotation marks omitted)).  To this end, the implied covenant prohibits a party from exercising "contractual discretion in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn*, 156 F.3d 535, 542 (4th Cir. 1998).  Accordingly, if a party possesses a discretionary power under the contract, "that party cannot act arbitrarily or unfairly" in exercising that discretion. *Stoney Glen, LLC v. S. Bank & Tr. Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013).  The implied covenant does not, however, "prevent a party from exercising its explicit contractual rights." *Va. Vermiculite*, 156 F.3d at 542.  But if a party has a contract right, then that party is only forbidden from acting dishonestly. *Enomoto*, 624 F. Supp. 2d at 450-51.  Thus, the "case law shows two ways in which the duty of good faith and fair dealing may be breached:  (1) where a party has a clear contract right, even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly; (2) but where a party has discretion in performance, that party cannot act arbitrarily or unfairly." *Stoney Glen*, 944 F. Supp. 2d at 466 (cleaned up).

Plaintiffs do not properly allege a breach of the implied covenant, because Plaintiffs' allegations do not relate to Defendant's exercise of its rights or obligations under the parties' contract.  Plaintiffs do not allege that Defendant acted arbitrarily or unfairly in the exercise of any discretion bestowed upon it by the CTA.  Nor does Plaintiff allege that Defendant dishonestly exercised a right bestowed upon it by the CTA.  Plaintiffs' allegations stem entirely from Defendant's deficient invoicing and remittance, activities which have no basis in the CTA.  As alleged by Plaintiffs, Defendant's invoicing and remittance activities resulted from it

21

assuming *extra-contractual* duties not found in the CTA and not agreed upon by the parties. Because Plaintiffs' claims do not hinge on whether Defendant abused its discretion under the contract or exercised a contract right dishonestly, Plaintiffs have not alleged a breach of the implied covenant of good faith and fair dealing with respect to Defendant's alleged failures in invoicing and remitting payments.

The Court will dismiss Count I as it relates to Plaintiffs' allegations of Defendant's breach of the implied covenant of good faith and fair dealing in invoicing and remitting payments. The Court will not dismiss Count I as it relates to Plaintiff's allegations that Defendant prevented Plaintiffs from invoicing the States directly.

> ii.     **Plaintiffs Have Not Alleged a Claim for Breach of Fiduciary Duty.**

In Count Four, Plaintiffs allege that Defendant breached its fiduciary duties that it owed Plaintiffs under the CTA.  (Am. Compl. ¶¶ 156-61.)  Defendant moves to dismiss this count, arguing that Defendant did not owe Plaintiffs any fiduciary duties under the CTA.  (Def.'s MTD Mem. at 19.)

In Virginia, "the elements of a breach of fiduciary duty claim are:  (1) the defendant owes a fiduciary duty, (2) the defendant breached that fiduciary duty, and (3) the breach of fiduciary duty resulted in damages." *Plumbers & Steamfitters Union Loc. No. 10 v. Waters*, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020).  Plaintiffs' claim fails to satisfy the first element — the existence of a fiduciary duty.

Under Virginia law, a fiduciary duty exists when special confidence has been imposed on an individual who is, as a result, legally obligated to act in the best interest of the party that imposes the special confidence. *Allen Realty Corp. v. Hobert*, 318 S.E.2d 592, 595 (Va. 1985). Although Virginia law recognizes that a fiduciary duty can possibly arise from a contract, the

22

predicate fiduciary duty relationship cannot exist "between the parties solely by virtue of [a] contract." *Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 293, 295 (Va. 2007) ("Any fiduciary duty allegedly breached in this case existed solely because of the contractual relationship between Augusta Mutual and Lee-Curtis, and in turn, its employee, Jones.  Therefore, we hold that Augusta Mutual failed to assert a valid claim for breach of fiduciary duties.").  "In other words, where there is a 'typical business relationship,' evinced by a contract, the court may not create a fiduciary relationship without other evidence that the parties 'intended to create a fiduciary relationship.'" *4D-Enters., LLC v. Aalto Hyperbaric Oxygen, Inc.*, 2020 WL 13200228, at *4 (E.D. Va. July 10, 2020) (quoting *Vicente v. Obenauer*, 736 F. Supp. 679, 695 (E.D. Va. 1990)).  The existence of a fiduciary relationship depends on the extent to which the alleged fiduciary is vested with significant discretion in the management of the principal's affairs. *Id.*; *Oden v. Salch*, 379 S.E.2d 346, 351 (Va. 1989); *see also Wachovia Bank, N.A. v. Preston Lake Homes, LLC*, 750 F. Supp. 2d 682, 690 (W.D. Va. 2010), *as corrected* (Nov. 15, 2010) (surveying case law for the proposition that courts look to control to determine the existence of a fiduciary duty).

Here, the parties' relationship constitutes a typical business relationship evinced by the CTA.  The CTA expressly declares that the parties "shall remain independent contractors under the terms of this Teaming Agreement." (CTA at 5.)  Further, the CTA provides that each party "will bear its respective costs, risks, and liabilities incurred as a result of its obligations and efforts under" the CTA.  (CTA at 2.)  Finally, the CTA provides that the parties "may individually compete for each purchase order issued by the Government." (CTA at 3.)  Plaintiffs allege, without supporting facts, that Defendant owed fiduciary duties as team leader under the CTA.  (Am. Compl. ¶ 29.)  However, Plaintiffs do not allege any facts demonstrating that

23

Plaintiffs vested Defendant with any discretion in the management of its affairs, much less "significant discretion." Indeed, the above provisions in the CTA make clear that, although the parties agreed to work together to obtain Government contracts, they otherwise intended to work independently in their own best interests. Thus, under Virginia law, Plaintiffs must point to other evidence that the parties intended to create a fiduciary relationship.

Plaintiffs argue that the fiduciary relationship here arises out of an agency relationship between Plaintiffs and Defendant. (Pls.' MTD Opp. at 27-28.) Specifically, Plaintiffs argue that by taking on the invoicing duties, Defendants assumed a fiduciary duty. However, the law "indulges no presumption that an agency exists." *Raney v. Barnes Lumber Corp.*, 81 S.E.2d 578, 584 (Va. 1954). "Under Virginia law, the determining factor when evaluating whether an agency relationship exists is the principal's power of control." *First American Title Ins. Co. v. First Alliance Title, Inc.*, 718 F. Supp. 2d 669, 678 (E.D. Va. 2010). However, "the question is not whether the party exercises control over the agent, but whether he has it." *Butterworth v. Integrated Resources Equity Corp.*, 680 F. Supp. 784, 789 (E.D. Va. 1988).

The Amended Complaint contains no allegations allowing the Court to infer the requisite level of control. Moreover, the Amended Complaint offers no allegations to infer that Plaintiffs consented to an agency relationship with Defendant. Plaintiffs argue that the "manifestation of consent by Plaintiffs to have ACI undertake the role of invoice management clearly creates a fiduciary relationship." (Pl.'s MTD Opp. at 28 (citing *Broadhead v. Waterson*, 2016 WL 742127, at *6 (W.D. Va. Feb. 24, 2016).) Yet, the allegations in the Amended Complaint belie this argument. Setting aside the question of whether assuming the administrative task of managing invoices could suffice to create a fiduciary duty, Plaintiffs' allegations do not manifest their consent to this agency relationship. Rather, Plaintiffs allege that they did not agree to have

24

Defendant manage the invoices and they consistently attempted to avoid having Defendant manage the invoices. (*See, e.g.*, Am. Compl. ¶ 34 ("[Plaintiffs] have offered repeatedly to take the burden of billing and collections for their services, but [Defendant] has refused these offers."). Thus, they did not manifest their consent to have Defendant act as their agent.

Plaintiffs correctly point out that the existence of a fiduciary relationship generally constitutes a factual question. However, courts properly dismiss breach of fiduciary counts in the absence of allegations that could plausibly support the existence of a fiduciary relationship. *See Broadhead*, 2016 WL 742127, at * 7 (granting motion to dismiss breach of fiduciary claim in "[t]he utter absence of the essential manifestations of consent for an agency relationship to exist"); *4D-Enterprises*, 2020 WL 13200228, at *4 (finding the plaintiff's complaint failed to state a claim for breach of fiduciary duty, because "there is nothing in the Agreement or in any non-conclusory allegations that make plausible that an agency relationship existed"); *see also Norton v. Wilkins & Co. Realty, Inc.*, 2022 WL 3050673 (W.D. Va. Aug. 2, 2022) (granting motion to dismiss where the allegations did not support the existence of a fiduciary relationship). Here, Plaintiffs' allegations do not support the argument that Defendant owed a fiduciary duty to Plaintiffs. Accordingly, the Court will grant Defendant's Motion as to Count Four.

Additionally, Plaintiffs' claim in Count Six for an Accounting in Equity stems from their allegation that Defendant owed Plaintiffs a fiduciary duty. Because the Court finds that Plaintiff has not properly pled the existence of a fiduciary duty, the Court will grant Defendant's Motion as to Count Six as well.

### iii.    Plaintiffs have Stated a Claim for Conversion.

In Count Five, Plaintiffs allege that Defendant improperly converted the funds paid by the States on Plaintiffs' invoices that should have been transmitted to Plaintiffs. (Am. Compl.

¶¶ 162-67.)  Defendant moves to dismiss this count, arguing that a claim for conversion cannot lie for an obligation created by contract.  (Def.'s MTD Mem. at 21.)

The tort of conversion "encompasses any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it."  *PGI, Inc. v. Rathe Productions, Inc.*, 576 S.E.2d 438, 443 (Va. 2003).  To state a claim for conversion under Virginia law, a plaintiff must plead "(i) the ownership or right to possession of the property at the time of the conversion and (ii) the wrongful exercise of dominion or control by defendant over the plaintiff's property."  *NorthStar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007, 1019 (E.D. Va. 2018).

Here, Plaintiffs have properly alleged facts to support the elements of conversion. Plaintiffs have alleged that the States paid Defendant for work performed by Plaintiffs, and that Defendant failed to remit that payment to Plaintiffs.  For example, Plaintiffs allege that Defendant "retained Washington and Idaho payments that were intended to be payments for Plaintiff's invoices and, upon information and belief, used those monies to fund ACI's operations by paying its subcontractors and itself before paying Plaintiffs" and also that ACI "is continually holding payments of Plaintiffs' invoices."  (Am. Compl. ¶¶ 32-33.)  Additionally, Plaintiffs allege that a public records request revealed that "as of March 31, 2022, Idaho had paid ACI $6,373,662.00 for ABSS invoices.  Prior to this point, ACI had not informed ABSS it had been paid by Idaho."  (Am. Compl. ¶ 73.)  The Amended Complaint contains other similar allegations that Defendant withheld money that rightfully belonged to Plaintiffs.  Accordingly, Plaintiffs have properly alleged the elements of conversion.

Defendant argues that a claim for conversion cannot lie if the control over the property exerted by the defendant "was wrongful only because it breached a defendant's duty under the contract." (Def.'s MTD Mem. at 21 (quoting *Gurwell v. Sea World Parks & Ent. LLC*, 2021 WL 4168503, at *13 (E.D. Va. Aug. 11, 2021).). Even if Defendants correctly state the law, that does not help them under these facts. As described above, Defendant's duty to remit the payments to Plaintiffs did not arise under the CTA.[5] The CTA contained no obligation regarding Defendant invoicing for Plaintiffs. Likewise, Plaintiffs do not allege any other agreement regarding invoicing that would give rise to a contractual obligation for Defendant to remit payment to Plaintiffs. Accordingly, Plaintiffs' allegation that Defendant exerted wrongful control over its property does not arise only because Defendant breached a duty under a contract. Therefore, Plaintiffs have properly pled a claim for conversion, and the Court will deny Defendant's motion with respect to Count Five.

### iv.    The Court Will Dismiss Count Seven.

In Count Seven, Plaintiffs ask the Court for a declaratory judgment that "[p]ursuant to the CTA, Plaintiffs are entitled to separately invoice the States of Washington and Idaho directly for the services rendered by Plaintiffs." (Am. Compl. ¶ 171.) Defendant moves to dismiss this count, in part because the declaratory judgment would require adding the State agencies as indispensable parties under Rule 19. (Def.'s MTD Mem. at 14.) However, Defendant argues that the Eleventh Amendment bars this Court from asserting jurisdiction over state governments.

---

[5]     The Federal Rules of Civil Procedure expressly permit Plaintiffs to plead that Defendant had an obligation under the CTA to remit payment or, alternatively, that Defendant converted the funds. Fed. R. Civ. P. 8(d)(2)-(3) (permitting alternative pleading); *Harrell v. Colonial Holdings, Inc.*, 923 F. Supp. 2d 813, 826-27 (E.D. Va. 2013) (explaining that the Federal Rules permit a party to alternatively plead theories of recovery, even if they cannot recover for both). Additionally, Plaintiffs do not rely on the CTA for their conversion claim.

(Def.'s MTD Mem. at 14.)  Defendant also argues that Plaintiffs have no right to invoice the States for work that they performed on Defendant's contracts with the States.

In opposing Defendant's Motion, Plaintiffs devote only a single footnote to opposing the dismissal of Count Seven.  In that footnote, Plaintiffs point out that Defendant's argument for dismissal of Count Seven rests on its flawed theory that the CTA does not constitute an enforceable contract.  However, Plaintiffs wholly failed to address Defendant's Eleventh Amendment argument.  By failing to contest Defendant's Eleventh Amendment argument, Plaintiffs have conceded that issue. *See East West, LLC v. Rahman* 873 F. Supp. 2d 721, 728 (E.D. Va. 2012) (citing *Kinetic Concepts, Inc. v. Convatec, Inc.*, 2010 WL 1667285, at *8 (M.D.N.C. Apr. 23, 2010) as recognizing the "general principle that a party who fails to address an issue has conceded the issue"); *Chamblee v. Old Dominion Sec. Co., L.L.C., et al.*, 2014 WL 1415095, at *8 (E.D. Va. Apr. 11, 2014) (noting that when a plaintiff addresses only some, not all, arguments in opposition to a motion to dismiss, a court may treat those unaddressed arguments as conceded).  Accordingly, the Court will grant Defendant's motion to dismiss with respect to Count Seven.[6]

<strong>v. Plaintiffs have Stated Claims for Fraud.</strong>

In Counts Eight and Nine, Plaintiffs bring claims for fraud based on Defendant's false representations that it would invoice the States and remit the payments to Plaintiffs.  Defendant

---

[6] Aside from conceding the Eleventh Amendment issue, the Court notes that Plaintiffs appear to seek a broader declaration than the language found in the CTA.  Although the Court finds that Plaintiffs have sufficiently alleged that the CTA constitutes a binding contract, the CTA states that the parties separately will invoice the States "for the work for which they have been *individually awarded*." (CTA at 3) (emphasis added).  Yet, Plaintiffs request a declaration that they may invoice the States for *services rendered*.  This could encompass a broader array of services than those individually awarded Plaintiffs, such as those awarded on a prime-subcontractor contract.

moves to dismiss this count, arguing that Plaintiffs have not alleged any misrepresentations outside of the parties' contract. (Def.'s MTD Mem. at 15.)

To state a claim for actual fraud, a plaintiff must show: "(1) a false representation (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party mislead, and (6) resulting damage to the party misled." *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999); *Suggs v. M&T Bank*, 230 F. Supp. 3d 458, 463-64 (E.D. Va. 2017). "Constructive fraud differs only in that the misrepresentation is not made with the intent to mislead, but is made innocently or negligently." *Hitachi Credit*, 166 F.3d at 628. Additionally, under Federal Rule of Civil Procedure 9(b), a plaintiff must state the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b). "These circumstances include the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Suggs*, 230 F. Supp. 3d at 46 (cleaned up).

Here, Plaintiffs have alleged sufficient facts regarding Defendant's statements about its ability to process invoices and remit payment to support a claim for fraud. First, Plaintiffs allege that Defendant represented that it had the administrative capacity, competency, experience and capability to perform its administrative and managerial duties under the CTA. (Am. Compl. ¶ 95.) This included the allegedly false representation that it had the competency and capability to manage the processing, billing, collection and disbursement of contract proceeds to the parties in a reasonable manner. (Am. Compl. ¶ 176.) Additionally, this included the representation that Defendant "would tender the proceeds of [Plaintiffs'] invoices when it was paid for them by the States." (Am. Compl. ¶ 177.) Plaintiffs allege that Defendants knew these representations to be false at the time of making and knew of its inability to manage the project. (Am. Compl. ¶ 178-

79.)  In reliance on these alleged misrepresentations, Plaintiffs allege that they "engaged dozens of contract employees and incurred massive expenses with the reasonable expectation that ACI would process and collect invoices and disburse proceeds to the CTA members in an orderly manner." (Am. Compl. ¶ 179.)  Finally, Plaintiffs allege that they suffered "considerable financial harm and damage to their good will as a result of their detrimental reliance upon these misrepresentations." (Am. Compl. ¶ 33.)  This financial harm included an improper markup and the expenses incurred as a result of the fees. (Am. Compl. ¶ 184.)  Additionally, in the absence of payments by the States, Plaintiffs had to incur interest from expanding their lines of credit to fund their contract performance. (Am. Compl. ¶ 184.)  The Court finds that these allegations sufficiently state a claim for fraud with respect to Defendant's ability to manage the payment process.

Additionally, Plaintiffs allege that Defendant committed fraud when it allegedly misrepresented that "Team ACI" had been awarded a contract by the State of Washington despite Defendant's subsequent claim that it entered into a prime contract with the State with Plaintiffs acting as subcontractors and not CTA team partners.  Plaintiffs claim that they "understood that they would be paid on a 'pass through' pricing basis" as CTA Team Members, rather than Defendant adding and collecting a markup on Plaintiffs' invoices. (Am. Compl. ¶ 127.)  Plaintiffs allege that they "reasonably believed they were in direct contractual privity with the States and had a right to submit invoices and be paid directly by the States." (Am. Compl. ¶ 116.)  However, they unwittingly performed the services pursuant to an unwritten subcontract relationship. (Am. Compl. ¶ 117.)  Had they known of this arrangement, Plaintiffs argue that they would not have provided the services in the absence of an agreement protective of their rights. (Am. Compl. ¶ 118.)  Plaintiffs allege the same damages as the other

misrepresentation claim.  Accordingly, the Court finds that Plaintiffs have sufficiently alleged a claim for fraud with respect to their claim of Defendant's representations relating to their status as co-equal team members rather than subcontractors.

Plaintiffs' claim for constructive fraud also survives, as it alternatively pleads that "[t]hese representations and/or omissions were made innocently or negligently."  (Am. Compl. ¶¶ 189, 192.)  Because only the intent differs for actual fraud and constructive fraud, these allegations suffice for Plaintiffs' Constructive Fraud claim to survive the motion to dismiss.  *See Richmond Metro. Auth. v. McDevitt Str. Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998) ("Constructive fraud requires proof, also by clear and convincing evidence, that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of reliance upon the misrepresentation.") (cleaned up).

Defendant argues that the alleged misrepresentations regarding the nature of "Team ACI" merely constitute a legal opinion regarding the status of the relationship, rather than a statement of fact that could give rise to a fraud claim.  However, Plaintiffs allege that Defendant misrepresented that the States had awarded orders to "Team ACI" in the same manner as provided in the CTA.  (Am. Compl. ¶¶ 111-14.)  Yet, even though Defendant would not be eligible to receive a prime contract without Plaintiffs as co-equals, Defendant then claimed the existence of a prime-subcontract relationship.  (Am. Compl. ¶¶ 114-15.)  Accordingly, it performed work "under false pretenses" that they had direct privity with the States and the ability to invoice them directly.  Rather than legal conclusions, these representations describe the factual circumstances that govern the parties' relationship.  Accordingly, the Court will not dismiss the fraud claim as based on legal opinions.

31

Moreover, Plaintiffs' allegations that Defendant concealed its inability to manage the payment of the contracts constitutes actionable fraud. "Under Virginia law, a concealment or omission of a material fact may also give rise to a claim of actual fraud." *Hitachi*, 166 F.3d at 629. To constitute actionable fraud, it must involve the "concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist." *Id.* Here, Plaintiffs allege that Defendant never disclosed to Plaintiffs that it lacked the ability to perform as Team Lead. (Am. Compl. ¶ 95.) Plaintiffs allege that they performed under the contract assuming that Defendant had the capacity to act as Team Lead. (Am. Compl. ¶ 99.)

Defendant further argues that Plaintiffs' fraud claims fail, because they have not alleged any fraudulent misrepresentations outside of the parties' contract. (Def.'s MTD Mem. at 14-15.) True, fraud may exist in a contractual setting only when the defendant harbored an intent not to perform the contract at the time of contracting. *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 537 (4th Cir. 1988). However, Defendant's argument fails for two reasons. First, as described above, the parties never had an agreement regarding Defendant's managing payments. Accordingly, any alleged misrepresentation with respect to its ability to manage payments did not relate to Defendant's obligations under the CTA and instead occurred outside of the parties' contract. Second, Plaintiffs allege that Defendant made these representations to induce Plaintiffs to rely on them and provide services that Defendant could not itself perform under its own FSS Contract. (Am. Compl. ¶ 183, 194.) Accordingly, Plaintiffs have stated a claim for fraud despite the existence of a contractual relationship between the parties.

For the reasons stated above, the Court will grant in part and deny in part Defendant's Motion to Dismiss with respect to Count One, grant in full with respect to Counts Four, Six and Seven, and deny in full with respect to Counts Five, Eight and Nine.

**B.    Plaintiffs' Motion to Dismiss Defendants' Counterclaim**

      **i.    Defendant has Failed to State a Claim for Breach of Contract.**

In Count One of Defendant's Counterclaim, Defendant alleges breaches of enforceable subcontracts that existed between Defendant and Plaintiffs to perform some of the work orders issued by the States. (Counterclaim ¶¶ 75-84.) Defendant alleges that these subcontracts arose as implied-in-fact contracts. (Counterclaim ¶ 27.) Plaintiffs move to dismiss Count One, arguing that Defendant has not alleged the existence of valid subcontracts nor a breach of any material terms of the subcontracts. (Pls.' MTD Mem. at 4-5.) The Court agrees with Plaintiffs that Defendants have not alleged the existence of valid subcontractor agreements.

In the absence of an express contract governing a particular subject matter, an implied contract may exist. *Spectra-4, LLP v. Uniwest Com. Realty, Inc.*, 772 S.E.2d 290, 295 (Va. 2015). Implied-in-fact contracts contain the same hallmarks of an express contract, except that "some of the terms and conditions are implied in law from the conduct of the parties." *Id.* The implied-in-fact contract "is created only when the typical requirements to form a contract are present, such as consideration and mutuality of assent." *Id.* "Without the intent to contract, a court cannot find a contract implied in fact." *Doe v. Washington & Lee Univ.*, 439 F. Supp. 3d 784, 790-91 (W.D. Va. 2020). An implied contract still requires mutuality of assent, with the parties' conduct establishing the terms of the contract. *Id.* Importantly, "the parties' conduct must also establish what the terms of the contract are." *Spectra-4, LLP*, 772 S.E.2d at 295. As with an express contract, there must be "mutual assent of the contracting parties *to terms reasonably certain* under the circumstances in order to have an enforceable contract." *Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981).

33

Here, Defendant's allegations fall short of establishing the existence of an implied-in-fact subcontract. Defendant alleges that it included all of the material terms, "including periods and quantities of performance, ABSS's and WWM's billing rates, and ACI Federal's administrative fees." (Counterclaim ¶ 27.) However, Defendant does not allege the specifics of these terms, such that the Court can ascertain the terms of the contract. Defendant does not allege that the parties agreed on the scope of work or services or other definite terms.

Moreover, Defendant does not allege that the parties agreed to any terms regarding the manner of invoicing and remitting payments. Instead, Defendant alleges that it asked Plaintiffs to invoice it twice per month, but that Plaintiffs refused. (Counterclaim ¶ 36.) Therefore, Defendant's allegations demonstrate a lack of mutual assent to the manner of invoicing and remitting payments.

Aside from that proposed invoicing term which clearly lacks mutuality of assent, Defendant offers no allegations as to the manner of invoicing that would allow the Court to glean the parties' agreement on the term. Defendant does not allege that the parties agreed, either expressly or through their conduct, how often Plaintiffs would send invoices to Defendant, how many they would send or the time within which Plaintiffs would receive payment for those invoices. Yet, Defendant claims that Plaintiffs breached the implied contract through the manner and timing of the invoices that they sent, thereby necessarily claiming that invoicing constituted a material term. Without an agreement as to the reasonably certain terms governing the manner of invoicing, the Court has no way to determine whether Plaintiffs breached those terms. Accordingly, Defendant has failed to allege a reasonably certain implied-in-fact subcontract and, consequently, the existence of an enforceable contract. And, without the existence of a valid contract with respect to invoicing, Defendant's allegations regarding the breach of good faith

34

have no traction. *See Doe v. Washington & Lee*, 439 F. Supp. 3d at 192 ("Without an underlying contract, there can be no breach of contract or breach of good faith."). Accordingly, the Court will grant Plaintiffs' motion to dismiss with respect to Count One in the Counterclaim.

### ii.    Defendant has Stated a Claim for Tortious Interference with Existing Contract.

In Count Two, Defendant alleges that Plaintiffs interfered with Defendant's contracts with DOH by falsely accusing Defendant of not paying their invoices, by directly invoicing DOH for the work that they performed on the purported subcontracts and by performing work that DOH had already ordered from Defendant. Plaintiffs move to dismiss this count, arguing that Defendant has not properly alleged improper means on the part of Plaintiffs. (Pls.' MTD MEM. at 12-13.)

To state a claim of tortious interference with contract under Virginia law, a plaintiff must allege facts to support the following elements:

(1) the existence of a valid contract;

(2) defendant's knowledge of that contract;

(3) defendant's intentional inducing or causing a breach of that contract; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 671-72 (E.D. Va. 2015). These elements apply to interference with contract for contracts of a set duration. *Id.* at 672. "Additionally, when a contract is terminable at will, a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed *improper* methods." *Lewis-Gale Med. Ctr., LLC v. Alldredge*, 710 S.E.2d 716, 720 (Va. 2011); *Skillstorm, Inc. v. Electronic Data Systems, LLC*, 666 F. Supp. 2d 610, 616 (E.D. Va. 2009).

35

Plaintiffs primarily attack Count Two on the grounds that Defendant failed to allege that they used improper methods in their interference.[7]  Improper methods encompass a wide variety of conduct under Virginia law.  They include illegal or independently tortious means "such as violations of statutes, regulations, or recognized common-law rules." *Skillstorm*, 666 F. Supp. 2d at 616.  They can also include "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship . . . ." *Lewis-Gale*, 710 S.E.2d at 721 (cleaned up).  Additionally, "methods also may be improper because they violate an established standard of a trade or profession, or involve unethical conduct.  Sharp dealing, overreaching, or unfair competition may also constitute improper methods." *Id.*

Defendant has properly alleged that Plaintiffs used improper methods.  For example, Defendant alleges that Plaintiffs:

- repeatedly and falsely claimed that they would have to pull critical nursing staff from understaffed hospitals, unless DOH directly paid them and directly contracted with them;

- repeatedly lied to GSA and DOH about ACI Federal's supposed failure to process invoices or to pay ABSS and WWM, when in fact ABSS and WWM were responsible for ACI Federal having to audit ABSS' and WWM's error-riddled invoices, and because DOH's slow payments to ACI Federal were never ACI Federal's fault;

---

[7]     The parties dispute whether the contract constitutes an at-will contract.  However, because Defendant has properly alleged improper methods, the Court need not reach that question at this stage.

- deceived DOH into thinking that they would have to pull nurses out of Washington hospitals, due to supposed financial duress that ABSS and WWM did not actually experience;

- defamed ACI Federal by wrongfully telling DOH that ACI Federal mishandled invoices and funds; and

- wrongly put DOH under duress by claiming that ABSS and WWM would pull nurses from hospitals due to a lack of payments. This duress caused DOH to accede to ABSS's and WWM's demands, including demands that effectively caused DOH to breach the ACI-DOH Contracts.

(Counterclaim ¶ 92.) Defendant further includes more specific details to support the allegations above. (Counterclaim ¶¶ 45-61.)

Plaintiffs claim that the conduct alleged does not constitute improper methods, because they simply exercised their contractual rights and took steps to protect their employees, businesses and legal interests. (Pls.' MTD Mem. at 13.) While exercising contract rights in good faith cannot give rise to improper interference, Defendant alleges conduct that would not amount to good faith. Indeed, the gravamen of Defendant's interference claim stems from allegations that Plaintiffs made false representations to the States. Although discovery may reveal the truth of Plaintiffs' representations, at this stage Defendant has pled sufficient facts to allege that Plaintiffs used improper methods in interfering with Defendant's contract. Accordingly, Plaintiffs' motion with respect to Count Two will be denied.

### iii.   Defendant has Stated a Claim for Tortious Interference with Business Expectancy.

In Count Three, Defendant alleges that Plaintiffs tortiously interfered with their business expectancy. Plaintiffs move to dismiss this count, arguing that Defendant has failed to plausibly allege a valid business expectancy.

Under Washington law,[8] a claim of tortious interference with a business expectancy requires five elements: (1) the existence of a valid business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing a breach or termination of the expectancy; (4) through the use of improper means; and (5) resultant damage. *NW Monitoring LLC v. Hollander*, 534 F. Supp. 3d 1329, 1342 (W.D. Wash. 2021) (citing *Leingang v. Pierce Cnty. Medical Bureau, Inc.*, 930 P.2d 288, 300 (Wash 1997)). Aside from recycling their challenge to the improper means allegation for the fourth prong, Plaintiffs argue that Defendant has not met the first prong.

Washington courts require something less than an enforceable contract to establish a valid business expectancy. *Scymanski v. Dufault*, 491 P.2d 1050, 1055 (Wash. 1971). "A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value." *Tori Belle Cosmetics LLC v. Meek*, 2022 WL 670923, at *7 (W.D. Wash. Mar. 7, 2022). A plaintiff must allege a "relationship between parties contemplating a contract, with at least a reasonable expectancy of fruition." *Scymanski*, 491 P.2d at 1055. Washington courts "allow tortious interference claims where a defendant's acts destroy a plaintiff's opportunity to obtain prospective customers." *Tori Belle Cosmetics*, 2022 WL 670923, at *7. Although a plaintiff must show more than "merely wishful thinking," courts "require a plaintiff to show only that its future business opportunities are a reasonable expectation." *Id.*

---

[8]   The parties agree that Washington law applies to Count Three.

38

Here, Defendant sufficiently alleges facts to support a valid business expectancy under Washington law. Clearly, Defendant alleges an existing relationship with DOH. (Counterclaim ¶ 14.) Defendant further alleges that DOH has and had a continuing need for the same type of services that it acquired from Defendant. (Counterclaim ¶ 98.) Moreover, Defendant "expected that DOH would contract with [Defendant] for those needs, just as DOH had done under the ACI-DOH Contracts and Task Orders issued pursuant to them." (Counterclaim ¶ 98.) Defendant alleges that had Plaintiffs not lied to DOH about Defendant, then Defendant "unquestionably would have received the work under [Plaintiffs'] Follow-On Contract." (Counterclaim ¶ 66.) Additionally, Defendant alleges that Plaintiffs "misled and pressured [DOH] not to obtain its continuing needs from ACI Federal." (Counterclaim ¶ 100.) Moreover, Defendant alleges that it "expected long-lasting business with these hospitals for years into the future." (Counterclaim ¶ 102.)

These allegations clear the relatively low bar for pleading the existence of a valid business expectancy in Washington. In *Tori Belle*, the court found that the plaintiff had adequately alleged a valid business expectancy, because the plaintiff alleged that it "was a fully functional venture with existing customers, a sales track record, and reasonable expectations for the 2020 holiday season which were allegedly not met because of defendants' interference." 2022 WL 670923, at *7. Defendant's allegations here track or even exceed those in *Tori Belle*. At bottom, Defendant alleges that it had a relationship with a specific customer, that customer had ongoing needs that Defendant expected to fulfill, but that the customer did not select Defendant to fill those needs due to Plaintiffs' interference. Although discovery may reveal Defendant's expectation to be unreasonable, or that Plaintiffs' interference did not cause the

disruption in the expectation, Defendant has sufficiently alleged facts to support a claim for tortious interference with business expectancy under Washington law.

### iv.    Defendant has Stated a Claim for Defamation.

In Count Four, Defendant alleges that Plaintiffs defamed it by publishing libelous statements about it to GSA, DOH and IMD. (Counterclaim ¶¶ 105-10.)  Plaintiffs move to dismiss this count, arguing that Defendant has not alleged actionable statements or the requisite intent. (Pls.' MTD Mem. at 22-26.)

The Court must first determine which law to apply to Defendant's defamation claim.  A federal court sitting in diversity applies the law of the state in which it sits, including the state's choice of law rules. *Wiest v. E-Fense, Inc.*, 356 F. Supp. 2d 604, 608 (E.D. Va. 2005) (citing *Klaxton v. Stentor*, 313 U.S. 487, 497 (1941)).  For tort actions like defamation, Virginia applies the *lex loci delecti* rule, which looks to the law of the place of the wrong. *Id.*  The place of publication constitutes the place of the wrong and, with respect to email, "the place of publication is deemed to be the place where the email was received (i.e., opened and read)." *Galustian v. Peter*, 561 F. Supp. 2d 559, 565 (E.D. Va. 2008), *rev'd in part on other grounds*, 591 F.3d 724 (4th Cir. 2010).  The Court can assume that a recipient opened and read an email where that recipient maintains its principal place of business. *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 503 (W.D. Va. 2019).

Plaintiffs argue that this would require applying Washington law to statements published to DOH, Idaho law to statements published to IMD and District of Columbia law to statements published to GSA. (Pls.' MTD Mem. at 21.)  Instead of applying this patchwork of law, Plaintiffs press the court to apply Washington law to all as the place where Defendant suffered the most alleged harm. (Pls.' MTD Mem. at 22.)  Defendant agrees that the law of the three

different states will apply at trial. (Def.'s MTD Resp. at 25.) However, Defendant contends that all three jurisdictions employ substantially the same law of defamation. (Def.'s MTD Resp. at 25-26.) The Court agrees with Defendants that the jurisdictions employ defamation law similar enough for the purposes of resolving this motion. Applying Washington law, as Plaintiffs urge and Defendant applies in its brief, the Court finds that Defendant has stated a claim for defamation.

In Washington, a "defamation action consists of four elements: (1) a false statement, (2) publication, (3) fault, and (4) damages." *Duc Tan v. Le*, 300 P.3d 356, 363 (Wash. 2013).[9] Here, Defendant alleges numerous false statements made by Plaintiffs to the States and GSA, including that:

- "ACI was mismanaging the processing and payment of invoices" (Counterclaim ¶ 47);

- Defendant "was choosing not to pay them for their work" (Counterclaim ¶ 48);

---

[9]     In Idaho, a defamation claim requires that the defendant "(1) communicated information concerning the plaintiff to others; (2) that the information was defamatory; and (3) that the plaintiff was damaged because of the communication." *Elliott v. Murdock*, 385 P.3d 459, 465 (Idaho 2016).

Similarly, in Washington D.C., a plaintiff must show four elements to state a claim for defamation:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Xereas v. Heiss*, 933 F. Supp. 2d 1, 17 (D.D.C. 2013). For the same reasons that the allegations state a claim for defamation under Washington law, the Court finds that the allegations would meet the above elements for Idaho and D.C. law.

- Plaintiffs "misrepresented to two GSA officials that ACI Federal was misspending funds that it should have paid them, even once falsely suggesting to them that ACI Federal was spending their money on boats" (Counterclaim ¶ 49);

- Plaintiffs "misrepresented that ACI Federal sat on payments from DOH and IMD and failed to forward [Plaintiffs'] shares to those payments" (Counterclaim ¶ 49);

- Plaintiffs "claimed that ACI Federal was purposefully soliciting ABSS employees in breach of the non-solicitation provision of the CTA.  But ACI Federal did no such thing" (Counterclaim ¶ 51);

- "ABBSS falsely told DOH and IMD that a hotel vendor was refusing to support ACI Federal's work, which was simply not true" (Counterclaim ¶ 51);

- Plaintiffs "began falsely stating to GSA, DOH and IMD that the two companies were in dire economic circumstances and needed relief to their benefit and to ACI Federal's detriment" (Counterclaim ¶ 52);

- ABSS "*repeatedly* told GSA, DOH and IMD that they were on the verge of having to withdraw nurses from hospitals if they did not receive immediate payments directly from the States rather than through ACI Federal . . . . There claims of financial stress were never true" (Counterclaim ¶ 53-4);

- ABSS' Vice President sent an email to all Idaho hospitals where its employees were working and "falsely stated that ACI Federal had put ABSS in financial jeopardy" and threatened to pull nurses from the hospitals (Counterclaim ¶ 70).

Thus, Defendant has plainly alleged the first two elements — publication of a false statement.  Additionally, Defendant alleges that Plaintiff made these misrepresentations to "wrest control of the work away from ACI Federal."  (Counterclaim ¶ 56.)  Further, Defendant alleges

42

that Plaintiffs "knew these statements were false and they intended to harm ACI Federal's reputation with GSA, DOH and Idaho." (Counterclaim ¶ 107.)  Defendant further alleges that Plaintiffs' campaign of misrepresentations "eventually took root," as "DOH effectively stopped paying most invoices submitted by ACI Federal." (Counterclaim ¶ 59.)

With respect to damages, Defendant alleges that its "reputation with GSA, DOH, and other subcontractors on the team has been harmed, and it has experienced increased costs to manage crises caused by [Plaintiff's] conduct." (Counterclaim ¶ 61.)  Moreover, it alleges that it lost out on work from DOH as a result of Plaintiffs' conduct. (Counterclaim ¶ 64.)  Thus, Defendant has properly alleged the third and fourth elements of a defamation claim.

Plaintiffs argue that these allegations fail to allege the statements with specificity, seemingly imputing a heightened pleading standard to defamation claims.  However, even if the state law has a heightened pleading requirement, "a plaintiff need not satisfy the state's heightened pleading requirements to survive a Rule 12(b)(6) motion; the Federal Rules of Civil Procedure govern his pleading." *Skillstorm*, 666 F. Supp. 2d at 619, n.1 (rejecting application of Virginia's heightened pleading standard for defamation claim in federal court); *see also Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 329 (4th Cir. 2005) ("While the Federal Rules of Civil Procedure require more specific pleading in certain cases, defamation cases are not among them.").

Additionally, Plaintiffs argue that the alleged false statements attributed to them were true or that Plaintiffs did not know of their falsity.  However, Defendants have explicitly pled the falsity of the statements and Plaintiffs' knowledge of such.  Although discovery may demonstrate the truth of these statements, the Court must take Defendant's allegations as true at this stage.  Therefore, it rejects Plaintiffs' truth defense at this stage.

Thus, applying the familiar standard for a rule 12(b)(6) motion, and taking the facts alleged as true, Defendant has alleged sufficient factual information to state a claim for defamation that is plausible on its face. Accordingly, the Court will deny Plaintiffs' motion with respect to Count Four.

### v.     The Court Will Dismiss Count Five.

In Count Five, Defendant brings a claim for Business Conspiracy under Virginia law, alleging that Plaintiffs conspired to interfere with its business expectancy and to defame Defendant. (Counterclaim ¶¶ 111-15.) Plaintiffs move to dismiss this count on the grounds that Virginia's business conspiracy statute does not apply to extraterritorial conduct that gave rise to the alleged conspiracy.

Defendant does not contest this point and, therefore, the Court will grant Plaintiffs' motion with respect to Count Five. Defendant requests leave to amend to bring a business conspiracy count under Washington law. However, Defendant has not filed a separate motion requesting leave to amend under Rule 16(b)(4) and Rule 15, as required by the Court's Scheduling and Pretrial Order (ECF No. 39). Accordingly, the Court will deny Defendant's request to amend.

### IV.     CONCLUSION

For the reasons stated above, the Court will GRANT IN PART and DENY IN PART Defendant ACI Federal Inc.'s Motion to Dismiss Counts One and Four Through Nine of the First Amended Complaint (ECF No. 50). Specifically, the Court will GRANT IN PART and DENY IN PART Defendant's Motion with respect to Count One. The Court will GRANT Defendant's Motion with respect to Counts Four, Six and Seven, and will DENY Defendant's Motion with respect to Counts Five, Eight and Nine. Additionally, the Court will GRANT IN PART and

DENY IN PART Plaintiffs' Motion to Dismiss ACI Federal's Counterclaim (ECF No. 44).

Specifically, the Court will GRANT Plaintiffs' Motion with respect to Counts One and Five, and

DENY Plaintiffs' Motion with respect to Counts Two, Three and Four.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  October 31, 2022